UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

BLAKE COMISKEY,
    Plaintiff,

v.   07-2241

SHARON BROWN,
    Defendant.

MEMORANDUM OPINION AND ORDER

Before the court is the Defendant's unopposed summary judgment motion [36]. The Defendant, SHARON BROWN, by her attorneys, Heyl, Royster, Voelker & Allen, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and CDIL-LR 7.1(D) seeks summary judgment.

Background

On December 20, 2007, Plaintiff, Blake Comiskey, filed his complaint against Sharon Brown. The complaint arises from Plaintiff's depression and anxiety with suicidal tendencies while incarcerated at the Macon County Jail ("Jail"). Plaintiff's complaint, brought under 42 U.S.C. Section 1983, alleges that Defendant, Sharon Brown, did not provide treatment to Plaintiff while he was on suicide watch and that he was punished for his symptoms of suicidal tendencies by being placed in a cell without clothes, heat, bedding, and one-half rations. On February 4, 2008, this court held a merit review hearing regarding Plaintiff's Complaint. The court allowed the Plaintiff to proceed on his claim under the Fourteenth Amendment, that the Defendant was allegedly deliberately indifferent to his serious medical needs, and by punishing him for his request for medical attention. Defendant filed an Answer to the merit review order denying those allegations. Discovery has been conducted and concluded. For the reasons set forth below, Sharon is entitled to summary judgment.

Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

Undisputed Material Facts[1]

1. Sharon Brown is an employee of Heritage Behavioral Health, Inc., in Decatur, Illinois (Brown Aff., ¶ 3, Exhibit 1).
2. Prior to working at Heritage Behavioral Health, Inc., Sharon Brown worked from 1993 to 2000 as a treatment counselor for the Illinois Department of Corrections. (Brown Aff., ¶ 5).
3. Sharon Brown possesses a Bachelors of Science degree in psychology and is not a licensed medical doctor nor able to prescribe medication. (Brown Aff., ¶¶ 6, 7, 8).
4. Sharon Brown has been employed by Heritage Behavioral Health, Inc., since May 1, 2000. (Brown Aff., ¶ 4).
5. The Macon County Jail hires outside contractors to provide mental health services to the inmates in the Macon County Jail. (Jones Aff., ¶ 6, Exhibit 2).
6. Likewise, the Macon County Jail contracts outside medical health providers to provide medical care for inmates at the Macon County Jail. (Jones Aff., ¶ 6).
7. Part of Sharon Brown's employment with Heritage Behavioral Health, Inc., is working at the Macon County Jail as a mental health counselor (hereafter "counselor"), providing mental health services. (Brown Aff., ¶ 4).
8. As a counselor, Sharon Brown is responsible for evaluating and assessing mentally ill inmates and inmates with substance abuse issues, in addition to performing immediate crisis intervention assistance at the Macon County Jail. (Brown Aff., ¶ 4).

---

[1]Exhibits are attached to the defendants' memorandum of law [37].

9. Sharon Brown worked as a counselor in November and December of 2006 at the Macon County Jail. Her regular work hours were from 8:00 a.m. to 5:00 p.m., Monday through Friday. (Brown Aff., ¶ 9).
10. Sharon Brown was on vacation and not physically at the Macon County Jail from December 7, 2006 through December 17, 2006. (Brown Aff., ¶ 47).
11. On October 31, 2006, Blake Comiskey became an inmate at the Macon County Jail. (Jones Aff., ¶ 18); (Comiskey Dep., pgs. 7, 15, Exhibit 3).
12. When Blake Comiskey was booked into the Macon County Jail, he did not convey that he was having suicidal thoughts, nor did he convey or appear to have anything physically wrong with him at the time. (Comiskey Dep., pgs. 14, 15).
13. On November 29, 2006, Correctional Officer Patrick Smith was assigned to the housing area of the Macon County Jail, Trod Number1, where Inmate Blake Comiskey was being housed. (Smith Aff., ¶¶ 3, 6, Exhibit 4).
14. On November 29, 2006, at approximately 10:00 p.m., Inmate Blake Comiskey told Correctional Officer Smith he was feeling stressed and wanted to be moved to segregation. (Smith Aff., ¶ 7).
15. Correctional Officer Smith advised Blake Comiskey that segregation was full. (Smith Aff., ¶ 7).
16. At that time, Blake Comiskey told Correctional Officer Smith that he was depressed and suicidal. (Smith Aff., ¶ 8); (Comiskey Dep., pgs. 16 -17, 56).
17. Under Macon County Jail policies and procedures, if an inmate of the Macon County Jail states to a correctional officer that he is suicidal, the correctional officer takes the inmate to an intake holding cell and he is placed on a suicide watch. (Jones Aff., ¶ 8); (Smith Aff., ¶ 9); (Comiskey Dep., pg. 16).
18. After stating he was suicidal, Blake Comiskey was taken to an intake holding cell and placed on a suicide watch pursuant to the Macon County Jail policies and procedures. (Smith Aff., ¶ 10); (Jones Aff., ¶ 19); (Comiskey Dep., pgs. 16, 56).
19. Under Macon County Jail policies and procedures, the mental health department is notified after an inmate is taken to an intake holding cell and placed on suicide watch, and mental health will advise whether an inmate should remain on a suicide watch. (Jones Aff., ¶ 8).
20. After Comiskey was taken to an intake holding cell and placed on suicide watch, a referral was made to the mental health department of the Macon County Jail notifying that Comiskey had made suicidal threats and thereafter been placed on suicide watch. (Smith Aff., ¶ 11).
21. Additionally, to allow Comiskey to receive his medications and monitor his well being, the medical department of the Macon County Jail was notified that Inmate Comiskey was in an intake holding cell and on suicide watch. (Smith Aff., ¶ 11); (Brown Aff., ¶ 21).
22. Macon County Jail abides by the same suicide watch policies and procedures for all inmates who are put on suicide watch. (Jones Aff., ¶ 15).
23. Under Macon County Jail policies and procedures, an inmate who is placed on suicide watch in the Macon County Jail is not permitted to wear any clothing other than a suicide smock provided to him. (Jones Aff., ¶ 9).

24. A suicide smock is a gown-like garment made of very thick material that is very difficult to rip or shred in any way that might allow an inmate to use the shreds as a tool of suicide.  (Jones Aff., ¶ 9); (Brown Aff., ¶ 43).
25. After Comiskey was placed on suicide watch, he was not permitted to wear any clothing other than the suicide smock provided to him while he remained on suicide watch.  (Jones Aff., ¶¶ 9, 23); (Comiskey Dep., pgs. 16, 30).
26. Under Macon County Jail policies and procedures, an inmate who is placed on suicide watch is not provided a mattress, as mattresses are capable of being ripped and being used as a tool of suicide.  (Jones Aff., ¶ 10).
27. Pursuant to Macon County Jail suicide watch policies and procedures, Comiskey, while on suicide watch, was not provided a mattress.  (Jones Aff., ¶ 24).
28. Under Macon County Jail policies and procedures, an inmate who is placed on suicide watch is placed by himself in the booking area in an intake cell where they can be routinely monitored with increased frequency.  Pursuant to Macon County Jail policies and procedures, an inmate on suicide watch is monitored every 15 minutes by a visual check on his or her status in the cell.  (Jones Aff., ¶ 11); (Brown Aff., ¶ 14).
29. While Comiskey was on suicide watch, he was housed in an intake cell, where he was monitored every 15 minutes pursuant to the Macon County Jail policies and procedures.  (Jones Aff., ¶ 25).
30. The heating and cooling in the Macon County Jail are controlled by the Decatur Public Building Commission, the Macon County Jail's landlord.  (Jones Aff., ¶ 16).
31. The heating and cooling condition in intake cell number 5, and all cells within the booking area, all jail cells, and the entire Macon County Jail, is under the Decatur Public Building Commission's control.  (Jones Aff., ¶ 16).
32. The cells in the Macon County Jail are not individually temperature controlled.  (Jones Aff., ¶ 17).
33. The same heat flows through the cells and the booking area, including the intake cells used to place the inmates on suicide watch.  (Jones Aff., ¶ 17).
34. Sharon Brown has no control over the heating or cooling conditions in the Macon County Jail, or any of the cells, including the intake cell where Blake Comiskey was housed during his suicide watch.  (Brown Aff., ¶ 39).
35. Sharon Brown was not at the Macon County Jail on the night of November 29, 2006.  (Brown Aff., ¶ 12); See (UMF ¶ 14).
36. When a mental health crisis arose, and a counselor was not present at the Macon County Jail, either Sharon Brown or another counselor would be called for crisis intervention.  (Brown Aff., ¶¶ 10, 46).
37. If another counselor did a mental health crisis intervention in Sharon Brown's absence, that counselor would place a memorandum of the meeting with the inmate in Sharon Brown's mailbox, providing an update on the status of the inmate.  (Brown Aff., ¶ 11).
38. Since Sharon Brown was not at the Macon County Jail on the night of November 29, 2006, another counselor, Edna Morgan, engaged in mental health crisis intervention with Blake Comiskey in response to his stated intent to commit suicide.  (Brown Aff., ¶ 16).
39. Sharon Brown worked at the Macon County Jail on November 30, 2006, the day after Blake Comiskey was placed on suicide watch.  (Brown Aff., ¶ 12); (Smith Aff., ¶¶ 8, 10).

40. On November 30, 2006, Sharon Brown was informed that the night before, November 29, 2006, Blake Comiskey told a correctional officer that he was suicidal, and in response was moved to an intake cell in the booking area and placed on suicide watch pursuant to Macon County Jail policies and procedures.  (Brown Aff., ¶¶ 13, 15).
41. On November 30, 2006, Sharon Brown received a copy of Edna Morgan's memorandum of her crisis intervention meeting with Blake Comiskey. According to the report Sharon Brown received, on November 29, 2006, Blake Comiskey stated that "he was going to die and there was nothing that can stop him."  (Brown Aff., ¶ 17).
42. Blake Comiskey stated that leaving him in an intake cell on suicide watch was not going to help because he would just drown himself in the toilet.  (Brown Aff., ¶ 17).
43. Blake Comiskey further stated that his original plan was to starve himself to death and asked the counselor, Edna Morgan, if his organs would shut down in about two weeks if he didn't have any water. Blake Comiskey indicated that he had not eaten in two days. (Brown Aff., ¶ 17).
44. Blake Comiskey also stated he had several prior suicide attempts.  Specifically, he indicated that he attempted suicide in September of 2006, but was stopped by the police. Blake Comiskey reported that his plan was to jump into Lake Decatur from a bridge and that he had taken steps to carry out his plan by tying rocks to his legs.  (Brown Aff., ¶ 17).
45. According to the report Sharon Brown received, Blake Comiskey was advised that he would be staying on suicide watch in an intake cell, wearing a suicide smock the night of November 29, 2006.  (Brown Aff., ¶ 18).
46. Blake Comiskey was further advised that he would be seen by Sharon Brown on the following day, November 30, 2006.  (Brown Aff., ¶ 18).
47. To that, Blake Comiskey stated he did not want to see Sharon Brown because she runs a mens' group.  Comiskey stated that he does not like groups and "what does she [Brown] know about mens' problems?"  (Brown Aff., ¶ 18).
48. On November 30, 2006, prior to meeting with Sharon Brown, Blake Comiskey, while in an intake cell in the booking area and under suicide watch, tried to commit suicide by cutting his wrist with a sharpened plastic spoon.  (Comiskey Dep., pg. 31); (Jones Aff., ¶ 20); (Brown Aff., ¶ 19).
49. Blake Comiskey had taken possession of a plastic spoon he received with his food tray and sharpened the plastic spoon by filing it against the wall, and attempted to use the spoon to cut his wrist.  (Brown Aff., ¶ 19); (Comiskey Dep., pg. 31).
50. Sharon Brown was informed that Blake Comiskey had attempted to commit suicide using a sharpened spoon prior to meeting with him on November 30, 2006.  (Brown Aff., ¶ 19).
51. That day, November 30, 2006, Sharon Brown met with Blake Comiskey for a one-on one crisis intervention meeting.  This was Sharon Brown's first counseling session with Blake Comiskey since he told correctional officers he was feeling suicidal.  (Brown Aff., ¶ 20); (Comiskey Dep., pg. 61).
52. When Sharon Brown met with Blake Comiskey on November 30, 2006, Blake Comiskey had already been placed on suicide watch and, pursuant to Macon County Jail suicide watch policies and procedures, was being monitored every 15 minutes by a visual check and was wearing a suicide smock.  (Brown Aff., ¶ 20).

53. On November 30, 2006, when Sharon Brown met with Blake Comiskey, he stated, "I will never leave this jail alive." (Brown Aff., ¶ 22).
54. At that time, Blake Comiskey would not discuss any mental health or substance abuse issues with Sharon Brown, despite Sharon Brown's efforts to help Blake Comiskey see his need for treatment. (Brown Aff., ¶ 22).
55. During the meeting, Comiskey was aggressive and verbally abusive to Brown. (Brown Aff., ¶ 22).
56. On other occasions, Comiskey was verbally abusive and "hateful" with correctional officers. (Comiskey Dep., pg. 36).
57. Brown determined that Comiskey needed to remain on suicide watch and consulted with jail command regarding this decision. (Brown Aff., ¶ 22).
58. At approximately 4:10 p.m. on November 30, 2006, Correctional Officer Patrick Smith, who had been previously informed by Macon County Jail command that Comiskey had attempted to commit suicide using a plastic spoon earlier that day, delivered a food tray to Comiskey. (Smith Aff., ¶¶ 13, 14).
59. Correctional Officer Smith checked Comiskey's tray shortly after delivering it and noticed that a spoon was missing. (Smith Aff., ¶ 14).
60. A few minutes later, Correctional Officer Smith again walked by Comiskey's cell and noticed that there was a broken plastic spoon on his tray. (Smith Aff., ¶ 14).
61. After noticing the broken plastic spoon on Comiskey's tray, Correctional Officer Smith ordered Comiskey out of his cell. The cell was searched and another spoon was found jammed in the chuckhole. (Smith Aff., ¶ 15).
62. Comiskey was then searched in the dressing area. Nothing additional was found hidden. (Smith Aff., ¶ 16).
63. During Correctional Officer Smith's search of Comiskey with Correctional Officer Shirley, Comiskey stated, "You guys can't keep me up here forever. I will find a way back to population and I will cut or hang myself. I will do whatever it takes." (Smith Aff., ¶ 16).
64. After the search, Comiskey was returned to his cell in the booking area where he was kept under suicide watch. (Smith Aff., ¶ 17).
65. It was brought to Brown's attention that after her crisis intervention counseling session with Comiskey, he again attempted to obtain spoons, which can be utilized as tools of suicide. (Brown Aff., ¶ 23).
66. Brown was also informed of Correctional Officer Smith's search of Comiskey's cell, finding hidden spoons, and Comiskey's suicidal statement to correctional officers. (Brown Aff., ¶ 24).
67. Pursuant to the Macon County Jail's policies and procedures, an inmate who is on suicide watch and attempts suicide by using an eating utensil, such as a plastic spoon, to cut oneself, would be placed on a finger food diet. (Jones Aff., ¶ 12).
68. The finger food diet is not a punishment; an inmate receives finger foods so as to not provide him with any additional tools of suicide with which he could harm himself. (Jones Aff., ¶ 12); (Brown Aff., ¶ 42).
69. The food service at the Macon County Jail is provided by outside contractors. The finger food diet at the Macon County Jail regularly consists of a sandwich, chips, drink, or

similar items which do not require an eating utensil.  (Jones Aff., ¶ 13); (Comiskey Dep., pg. 32).

70. An inmate who receives a finger food diet is not on a one-half ration diet.  (Jones Aff., ¶ 14).
71. Following Comiskey's attempt to commit suicide with an eating utensil and later hiding spoons in his cell, pursuant to Macon County Jail suicide watch policies and procedures, Comiskey was placed on a finger food diet so as to not provide him with any additional tools of suicide with which he could harm himself.  (Smith Aff., ¶ 18); (Jones Aff., ¶ 22); (Brown Aff., ¶ 25); (Comiskey Dep., pgs. 32 - 33).
72. On November 30, 2006, Correctional Officer Stan Boulware, who was assigned to the booking area at the Macon County Jail, observed Blake Comiskey, who was housed in intake cell number 5 in the booking area at the Macon County Jail.  At that time, Blake Comiskey was on suicide watch and wearing a suicide smock.  (Boulware Aff., ¶¶ 3, 4, 6, 7, attached hereto as Exhibit 5).
73. On November 30, 2006, Correctional Officer Boulware observed Comiskey, while housed in intake cell number 5 at the Macon County Jail, attempt to take a female inmate's shoe from under her cell door, intake cell number 6. (Boulware Aff., ¶ 8); (Jones Aff., ¶ 21).
74. Correctional Officers Boulware and Fonville took the shoe away from Comiskey. (Boulware Aff., ¶ 9).
75. Correctional Officer Smith asked Comiskey what he was doing. Comiskey responded that he was trying to get the shoe strings out of the female inmate's shoe so he could hang himself.  (Boulware Aff., ¶ 10).
76. After Comiskey had attempted to obtain another tool of suicide, the shoestrings, he was placed in a restraint chair to protect him from himself.  (Boulware Aff., ¶ 11).
77. After this incident, mental health was again notified of Comiskey's actions.  (Boulware Aff., ¶ 13); (Brown Aff., ¶ 26).
78. Blake Comiskey was on suicide watch at the Macon County Jail from November 29, 2006, through December 27, 2006.  (Brown Aff., ¶ 30); (Jones Aff., ¶¶ 19, 26).
79. Prior to meeting with Brown on November 30, 2006, Comiskey had seen a doctor at the Macon County Jail who gave him prescription medication, Zoloft and Risperdol, to treat his depression.  (Comiskey Dep., pgs., 25 - 26).
80. The medical staff had been made aware that Comiskey had been placed on suicide watch and Brown confirmed with the medical staff that Comiskey was receiving his psychiatric medications.  (Brown Aff., ¶ 21); (Smith Aff., ¶ 11).
81. Brown knew that Comiskey was under the medical care of the medical department at the Macon County Jail.  (Brown Aff., ¶ 21).
82. As a non-medical professional within the Macon County Jail, a counselor, Brown deferred to the medical care and treatment provided by those professionals who were treating Comiskey.  (Brown Aff., ¶ 21).
83. During the period of time that Comiskey was on suicide watch, Sharon Brown repeatedly met with him for formal one-on-one counseling meetings.  (Brown Aff., ¶¶ 20, 27, 28, 31, 33, 34, 36); (Comiskey Dep., pg. 33).

84. In addition to the formal one-on-one counseling meetings with Comiskey, Brown made routine, informal visual checks on Comiskey's status. Brown would walk by Comiskey's cell and observe him and ask questions of correctional officers to check on his status. (Brown Aff., ¶ 29); (Comiskey Dep., pg. 34).
85. During the period of time that Comiskey was on suicide watch, November 29, 2006 through December 27, 2006, on the days that Sharon Brown was working, she also would informally check on Comiskey between one and three times a day. (Brown Aff., ¶ 30).
86. On December 6, 2006, Brown met with Comiskey for a one-on-one counseling session. At that session, Brown tried to talk to Comiskey about the shoestring incident, but Comiskey refused to discuss the circumstances and his substance abuse issues with Brown. (Brown Aff., ¶ 27).
87. Comiskey stated, "If you do not get me out of this cell I will starve myself to death." (Brown Aff., ¶ 27).
88. Comiskey's multiple statements that he would kill himself and that he would not leave the Macon County Jail alive, coupled with the two overt acts of attempted suicide by cutting his wrists and obtaining strings from another inmate's shoes for purposes of hanging himself, caused Brown great concern for Comiskey's physical safety. (Brown Aff., ¶ 41).
89. Later on December 6, 2006, Brown again met with Comiskey to discuss the issues he was not willing to discuss earlier. (Brown Aff., ¶ 28).
90. Brown informed Comiskey that she had met with jail command and that he was to remain on suicide watch in the intake cell due to his two recent suicide attempts and his continued threats to commit suicide. (Brown Aff., ¶ 28).
91. After receiving this news, Comiskey became very angry, aggressive, and verbally abusive toward Brown and stated, "I will kill myself now." (Brown Aff., ¶ 28).
92. After returning from her vacation, on December 18, 2006, Sharon Brown again met with Comiskey for a one-on-one counseling session. (Brown Aff., ¶¶ 31, 47).
93. At that time, Comiskey stated he wanted out of the suicide watch intake cell, wanted hot food, and no longer wanted to eat a finger food diet. (Brown Aff., ¶ 31).
94. Brown discussed with Comiskey the seriousness of his two suicide attempts while in custody and her concern that he would do so again when he went back into the general population, especially based on his verbal representations. (Brown Aff., ¶ 31).
95. To this, Comiskey made a joke about, and did not want to take seriously, the fact that he had tried to gain tools of suicide to cut himself on the wrist and/or hang himself. (Brown Aff., ¶ 31).
96. Comiskey continued to refuse to discuss any substance abuse or suicide issues with Brown. (Brown Aff., ¶ 31).
97. During this meeting, Comiskey told Brown, "You tell Lt. Jones to get me out of this cell. I'm tired of being in here." Comiskey then dismissed Brown from his presence and refused to discuss anything further. (Brown Aff., ¶ 31).
98. Before leaving, Brown encouraged Comiskey to allow her to help him help himself, and that until he indicated to Brown that he would not harm himself, he would not be removed from suicide watch. (Brown Aff., ¶ 31).

99. Brown specifically asked Comiskey if he would be willing to attend her men's group discussion if he was removed from suicide watch. Comiskey replied, "No. You attend it." (Brown Aff., ¶ 31).
100. After Comiskey was initially placed on suicide watch and evaluated by mental health and medical staff, jail command personnel met repeatedly with mental health staff and/or medical staff to monitor Comiskey's status and well-being while he was on suicide watch. (Jones Aff., ¶ 27).
101. On December 19, 2006, Sharon Brown met with Lt. Jones, warden of the Macon County Jail, to discuss Comiskey's desire to be moved to the general population. (Brown Aff., ¶ 32); (Jones Aff., ¶ 27).
102. At that meeting, Brown and Lt. Jones discussed whether Comiskey could be trusted to not harm himself or others if he was returned to the general population. (Brown Aff., ¶ 32).
103. Based on Comiskey's continued representations, as well as his angry, aggressive, and negative attitude, it was decided that it was not safe to return him to the general population. (Brown Aff., ¶ 32).
104. Rather, a "reward system" was developed where additional benefits were returned to Comiskey a little at a time to see if he responded positively and proactively. (Brown Aff., ¶ 32).
105. Assuming that Comiskey was able to respond positively to the benefits, he would be able to build up the trust in the jail and ultimately return to the general population. (Brown Aff., ¶ 32).
106. On December 20, 2006, Sharon Brown again met for a one-on-one counseling session with Comiskey. (Brown Aff., ¶ 33).
107. At that time, Brown conveyed the "reward system" plan to Comiskey. (Brown Aff., ¶ 33).
108. During the meeting, Comiskey indicated he was concerned about getting off of suicide watch for Christmas. (Brown Aff., ¶ 33).
109. Brown indicated that there would be a way for Comiskey to work towards that goal and be able to have normal foods and normal housing. Brown advised Comiskey that if he was able to show in good faith that he was not going to harm himself or others, he would be taken off suicide watch. (Brown Aff., ¶ 33).
110. Later, in the afternoon of December 20, 2006, Sharon Brown met for another one-on one counseling session with Comiskey. (Brown Aff., ¶ 34).
111. At this meeting, Brown told Comiskey that he would be receiving a standard meal that day. (Brown Aff., ¶ 34).
112. Brown and Comiskey discussed the consequences of Comiskey not properly using the eating utensils and his need to return the same to the kitchen. (Brown Aff., ¶ 34).
113. At that time, Comiskey said he understood and was happy to receive and eat standard meals, but indicated he wanted out of the suicide watch intake cell. (Brown Aff., ¶ 34).
114. Brown informed Comiskey that there was still great concern because he had, on two separate occasions, attempted suicide while in custody just a few weeks earlier, and had made numerous statements threatening to kill himself and not leave the Macon County Jail alive. (Brown Aff., ¶ 34).

115. Comiskey indicated that he understood the concern and that he was not being punished for attempting suicide, but that he needed to continue to convey an understanding that he would help himself and value his own life such that he would able to avoid any tendency to commit suicide. (Brown Aff., ¶ 34).
116. During this one-on-one counseling session, Comiskey agreed to engage in counseling discussions regarding his depression and suicidal tendencies, as well as his substance abuse problems. (Brown Aff., ¶ 34).
117. At that time, Comiskey thanked Brown for her continued persistence and for obtaining standard meal privileges for him. (Brown Aff., ¶ 34).
118. On December 21, 2006, Brown met with Lt. Jones and Nurse Pam Lane, R.N., regarding Comiskey. (Brown Aff., ¶ 35); (Jones Aff. ¶ 27).
119. Brown conveyed that Comiskey was capable of complying with orders based upon his appropriate eating of the evening meal and returning of utensils and everything on his tray, and otherwise complying with the Macon County Jail rules. (Brown Aff., ¶ 35).
120. On December 27, 2006, Brown had her last formal one-on-one counseling session with Comiskey while he was on suicide watch. (Brown Aff., ¶ 35).
121. At that time, Comiskey told Brown that he was "never suicidal" but he was angry about being in jail in general and for law enforcement not helping him out with his current challenges. (Brown Aff., ¶ 36).
122. Based on Comiskey's strict compliance with the rules over the course of the prior week, along with agreeing to discuss the circumstances and engage in counseling on his issues, Comiskey earned enough trust that Brown informed Comiskey that she would talk with Lt. Jones about moving him into the general population of the Macon County Jail later that day. (Brown Aff., ¶¶ 36, 45).
123. Brown reached an understanding with Comiskey that before he would be allowed to return to the general population of the Macon County Jail, Comiskey had to agree that he would be fully responsible for any and all of his actions and to promise to speak with jail staff, Brown, other mental health professionals, and/or medical staff if he felt suicidal. (Brown Aff., ¶ 38).
124. Also, Comiskey had to agree that he would not take any further suicidal actions before he would be allowed to return to the general population. (Brown Aff., ¶ 38).
125. As promised, Brown met with Lt. Jones and recommended that Comiskey be removed from suicide watch and returned to the general population of the Macon County Jail. (Brown Aff., ¶ 37).
126. Brown advised Lt. Jones that Comiskey had demonstrated consistent positive behavioral changes with the reward system for at least a week. (Brown Aff., ¶ 37).
127. Brown also advised Lt. Jones that Comiskey had not verbally threatened to kill himself or take any actions consistent with wanting to kill himself during the past week. (Brown Aff., ¶ 37).
128. Brown further informed Lt. Jones that Comiskey had not degraded the jail staff or Brown, had returned all the items he was given in connection with eating, and had engaged in counseling with Brown. (Brown Aff., ¶ 37).
129. On December 27, 2006, Blake Comiskey returned to the general population of the Macon County Jail after cooperating with the jail rules, refraining from any further suicide

130. attempts, and thereafter promising to inform Brown, one of the correctional officers, other mental health professionals and/or the medical staff if he felt any suicidal thoughts or urges. (Jones Aff., ¶ 26).
130. Comiskey was able to return to the general population at the Macon County Jail until he was transported to the Illinois Department of Corrections. (Brown Aff., ¶ 46).
131. Blake Comiskey's Complaint is limited to the period of time he was on suicide watch, from November 29, 2006, through December 27, 2006. (Comiskey Dep., pgs. 28, 68); (Jones Aff., ¶¶ 19, 26).
132. During the time Comiskey was on suicide watch, he suffered no physical injury. (Comiskey Dep., pg. 66).
133. Blake Comiskey did not have any contact with Sharon Brown while an inmate at the Macon County Jail before he was placed on suicide watch, nor after he was returned to the general population of the Macon County Jail. (Comiskey Dep., pgs. 61 - 62).
134. Any and all of the actions taken within the approximately 30-day period complained of by Comiskey were taken in an effort to save his life and prevent him from acting out on his suicidal tendencies, and never to punish him. (Brown Aff., ¶ 44).
135. The purpose of the Macon County Jail suicide watch policies and procedures is to prevent inmates from committing suicide or otherwise harming themselves. (Jones Aff., ¶ 7).
136. To Sharon Brown's knowledge, at no time was Blake Comiskey ever deprived of appropriate clothing, heat, food, and/or a sleeping area. (Brown Aff., ¶ 40).
137. Rather, those items that he received in general population were changed when he was placed on suicide watch specifically to protect Comiskey from himself pursuant to the Jail's policies. (Brown Aff., ¶ 40).

Discussion and Conclusion

Defendant Sharon Brown is entitled to summary judgment because she was not deliberately indifferent to Plaintiff's serious medical needs. "Although the Eighth Amendment does not extend to pretrial detainees . . . the Due Process Clause of the Fourteenth Amendment protects pretrial detainees under the same standard as the Eighth Amendment." *Zentmyer v. Kendall County*, Ill., 220 F.3d 805, 810 (7th Cir. 2000) (citations omitted). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)(internal citations and quotation marks omitted). Second, "the prison official must have exhibited deliberate indifference to the inmate's health or safety." *Zentmyer*, 220 F.3d at 810 (*citing Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "The deliberate indifference standard is a subjective one." *Estate of Novack v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000). "To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a 'sufficiently culpable state of mind.'" *Greeno v. Daley*, 414 F.3d 645, 653 (*quoting Farmer v. Brennan*, 511 U.S. at 834). To be deliberately indifferent, a defendant "must know of the serious risk to the prisoner's health, i.e., the serious medical need at issue, and they must also consciously disregard that risk/need so

as to inflict cruel and unusual punishment upon the prisoner." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)(citations omitted).

In his complaint, Comiskey alleges that while he was a detainee in the Macon County Jail, he complained to Brown of depression and anxiety with suicidal tendencies. He further alleges that, instead of providing him with medical help, Brown placed him in a cell without clothes, heat, or bedding, with half rations for 30 days. At his deposition, Plaintiff clarified that his complaint against Sharon Brown is for her alleged failure to appropriately attend to his mental illness and depression while on suicide watch at the Macon County Jail. (Comiskey Dep., pg. 63). Brown is entitled to summary judgment regardless of whether Plaintiff's complaint alleges that Defendant failed to provide medical care or provided inappropriate mental health services.

Brown had not seen Plaintiff before he was placed on suicide watch and therefore could not have been deliberately indifferent to his serious medical needs until after that time, as they were not yet known to Brown She became involved with Comiskey after he had been placed on suicide watch as a result of telling a correctional officer he was suicidal. Brown, as a counselor, provided Comiskey counseling and mental health services while he was on suicide watch at the Macon County Jail and deferred to the medical staff of the Macon County Jail for Comiskey's medical care and treatment. Brown did not show conscious disregard to Comiskey's serious medical need. Instead, Comiskey was placed on suicide watch where he twice attempted to take his own life; Brown actively provided mental health services to the point that Comiskey was able to safely return to the general population of the Macon County Jail until he was transported to the Illinois Department of Corrections.

Blake Comiskey became an inmate of the Macon County Jail on October 31, 2006. (UMF ¶ 11). On November 29, 2006, at approximately 10:00 p.m., Comiskey told Correctional Officer Patrick Smith, who was assigned to Comiskey's housing area, that he was feeling stressed, depressed and suicidal. (UMF ¶ 13 - 16). Under Macon County Jail policies and procedures, if an inmate tells a correctional officer that he is suicidal, the inmate is taken to an intake holding cell and placed on suicide watch. (UMF ¶ 17). Pursuant to this policy, Comiskey was taken to an intake cell and placed on suicide watch and was required to wear a suicide smock . (UMF ¶¶ 18, 23 - 25). After being placed on suicide watch, the mental health department of the Macon County Jail was notified that Comiskey had made suicidal threats. (UMF ¶ 20). Brown was not at the Macon County Jail on the night of November 29, 2006. (UMF ¶ 35). However, another counselor, Edna Morgan was called for crisis intervention. (UMF ¶ 36). Morgan engaged in a mental health intervention with Comiskey in response to his stated intent to commit suicide. (UMF ¶ 38).

The next day, on November 30, 2006, Sharon Brown met with Comiskey for a one-on-one mental health crisis intervention counseling session. (UMF ¶¶ 39, 57). This was Brown's first counseling session with Comiskey since he told Correctional Officer Smith he was suicidal (UMF ¶ 51) and Brown's first contact of any kind with Comiskey since he became an inmate of the Macon County Jail on October 31, 2006. (UMF ¶ 133). To be deliberately

indifferent to Comiskey's serious medical need, Brown must have known of the serious risk to Comiskey's health and consciously disregarded that risk. *See Johnson*, 433 F.3d at 1010. Brown was not aware of Comiskey's suicidal threats until the day after those threats were made and after Comiskey had already been placed on suicide watch. (UMF ¶¶ 38 - 51). Thus, Brown could not have been deliberately indifferent to Comiskey's serious medical needs before the time that she became aware of the same, November 30, 2006.

Further, Plaintiff's claim that he was placed in a cell without any clothes, heat, and bedding as a punishment for expressing depression and anxiety to Brown is without merit. The record is clear, Comiskey was placed on suicide watch and was required to wear a suicide smock after he told Correctional Officer Smith he was suicidal; Brown had nothing to do with Comiskey
being placed on suicide watch. (UMF ¶¶ 13- 18). In fact, Brown was not aware of Comiskey's suicidal tendencies or his conversation with correctional officers until after he had been moved, placed in an intake cell, on fifteen minute visuals checks, and wearing a suicide smock. (UMF ¶¶ 18, 23 - 25).

Brown was not deliberately indifferent to Plaintiff's serious medical needs; but rather, deferred medical care and treatment to the medical professionals who were treating Plaintiff. A prison official does not disregard an inmate's complaint if she knows that the medical staff was monitoring and addressing the problem. *See Johnson*, 433 F.3d at 1010. Moreover, a prison official can reasonably defer to medical professionals opinions; such reliance on medical professionals does not constitute deliberate indifference. *Johnson*, 433 F.3d at 1010. "We do not think [a prison official's] failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate indifference." *Greeno*, 414 F.3d at 655 - 56. "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety are promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor." *Greeno*, 414 F.3d at 656 (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3rd Cir. 2004)). Once Sharon Brown was made aware of Mr. Comiskey's serious medical need (suicidal tendencies), she did not consciously disregard that need and therefore cannot be found to have been deliberately indifferent. *See Johnson*, 433 F.3d at 1010; *Zentmyer*, 220 F.3d at 810. As set forth below, Brown provided extensive mental health and counseling services to Comiskey during the time he was on suicide watch in the Macon County Jail. As for Comiskey's medical care and treatment, Brown reasonably deferred to the medical professionals who were treating Comiskey.

The Macon County Jail divides the responsibility for the mental health and medical needs of its inmates. (UMF ¶¶ 5 - 6). The Jail hires outside contractors to provide mental health services to the inmates of the Macon County Jail. (UMF ¶ 5). Specifically, Sharon Brown is employed as a counselor to provide these mental health services. (UMF ¶¶ 1, 5, 7 - 8). As a counselor, Brown is responsible for evaluating and assessing mentally ill inmates, inmates with

substance abuse issues, in addition to performing immediate crisis intervention at the Macon County Jail. (UMF ¶ 8). The Macon County Jail hires separate outside contractors to provide medical care for the inmates. (UMF ¶ 5). In fact, Brown cannot provide medical care. She is not a medical doctor and cannot prescribe medications. (UMF ¶ 3). In sum, medical care is the responsibility of the medical care providers at the Macon County Jail. (UMF ¶ 82). In this case, the division of labor worked as designed and thereby provided Comiskey with access to increased health and safety. *See Greeno*, 414 F.3d at 656 (discussing that dividing responsibility promotes inmate health and safety). On the one hand, Brown did her job as a counselor by providing counseling and other mental health services to Comiskey while he was on suicide watch. (UMF ¶¶ 51, 84, 86, 89, 92, 100 - 101, 106, 110, 118, 120). On the other, Comiskey's medical needs were addressed by the medical care providers. In fact, prior to being placed on suicide watch, Comiskey had seen a doctor at the Macon County Jail. (UMF ¶ 79). This doctor provided him psychiatric medications, Zoloft and Risperdol, to treat his depression. (UMF ¶ 79). To allow Comiskey to receive his medications and monitor his well being, the medical staff was made aware that Comiskey had been taken to an intake holding cell and was on suicide watch. (UMF ¶¶ 21, 80). Further, Brown knew that Comiskey was under the medical care and treatment of the medical staff at the Macon County Jail. (UMF ¶ 81). Moreover, Brown confirmed with the medical staff that Comiskey was receiving his psychiatric medications. (UMF ¶ 80). As a non-medical professional working within the Macon County Jail, Brown deferred to the medical care and treatment of Comiskey provided by the medical staff. (UMF ¶ 82). Under, *Johnson* and *Greeno*, Brown's decision to defer to the medical staff cannot be viewed as deliberate indifference. *See Johnson*, 433 F.3d at 1010; *Greeno*, 414 F.3d at 655 - 56. Knowing that Comiskey was under the care of the medical staff and having confirmed that he was receiving his psychiatric medications, Brown was justified in believing that he was in capable hands. *See Johnson*, 433 F.3d at 1011; *Greeno*, 414 F.3d at 656. No further action was required of Brown. She did not disregard Comiskey's need. *See Johnson*, 433 F.3d at 1010; *Greeno*, 414 F.3d
at 655-56. For these reasons, Sharon Brown is entitled to summary judgment on Plaintiff's claim that she was deliberately indifferent to his serious medical needs.

Sharon Brown recognized the seriousness of Comiskey's condition and did not act with deliberate indifference toward that known condition, but rather provided extensive mental health services. "Mere negligence or even gross negligence does not constitute deliberate indifference."
*Wilson v. Seiter*, 501 U.S. 294, 305 (1991); *see also Rapier v. Kankakee County*, 203 F.Supp.2d 978, 983 ("Deliberate indifference is more than negligence and approaches intentional wrongdoing."). Therefore, the Eighth Amendment is not a vehicle for bringing claims for medical malpractice. Brown is not a medical provider and therefore cannot be properly sued for medical malpractice. However, the allegations of Comiskey's complaint appear to be directed at the alleged insufficiency of the treatment, i.e. counseling, Brown provided to him for his mental illness and depression. (Comiskey Dep., pg. 63). Thus, the medical malpractice case law is analogous to Plaintiff's claims. Just as Section 1983 does not provide a vehicle to bring medical malpractice claims against a prisoner's physician, neither does Section 1983 provide a vehicle to bring a professional negligence claim against a prisoner's mental health counselor. *Estelle v.*

*Gamble*, 429 U.S. 97, 105 - 106 (1976). "Medical decisions that may be characterized as classic examples of matters for medical judgment, such as whether one course of treatment is preferable to another, are beyond the amendment's purview." *Snipes v. Detella*, 95 F.3d 586, 591 (7th Cir. 1996); *see also Greeno*, 414 F.3d at 653 ("neither medical malpractice nor a mere disagreement with the doctor's medical judgment amounts to deliberate indifference . . . ."). Such matters are questions of tort, not constitutional law." *Snipes*, 95 F.3d at 591 (7th Cir. 1996).

As outlined above, Brown reasonably deferred to the medical staff for Comiskey's medical needs. However, Brown did not stop there. While Comiskey was on suicide watch, Brown provided mental health services to Comiskey in her role as a counselor. The heart of Comiskey's complaint appears to be his dissatisfaction with Brown's course of mental health treatment, the nature and type of the counseling provided. (See Compl.); (Comiskey Dep., pg. 63). However, such dissatisfaction or disagreement about whether one course of treatment is preferable to another does not give rise to a constitutional violation. *See Snipes v. Detella*, 95 F.3d 586, 591 (7th Cir. 1996). Furthermore, the mental health services provided were effective. Comiskey did not commit suicide and was able to safely return to the general population of the Macon County Jail before being transferred to Illinois Department of Corrections custody. (UMF ¶¶ 129 - 130, 132). Comiskey was on suicide watch from November 29, 2006 through December 27, 2006. (UMF ¶¶ 78, 85, 131). During that time, Brown's regular work hours were Monday through Friday and she was on vacation from December 7, 2006 through December 17, 2006. (UMF ¶¶ 9 - 10). In other words, Brown worked thirteen of the days Comiskey was on suicide watch. Of those days, Brown met with Comiskey for seven formal counseling sessions. (UMF ¶¶ 51, 86, 89, 92, 106, 110, 120). In addition to the formal one-on-one counseling meetings, Brown would informally check on Comiskey between one and three times each day. (UMF ¶¶ 84 - 85). She would walk by Comiskey's cell, observe him and ask questions of correctional officers to check on his status. (UMF ¶¶ 84 - 85). Also, Brown met with Jail Command and the medical staff to discuss Comiskey's well being. (UMF ¶¶ 90, 100 - 105, 118 - 119, 125 - 128). As a matter of law, Brown's conduct does not constitute deliberate indifference. Rather than conscious disregard, the amount of time and effort expended clearly shows that Brown recognized the seriousness of Comiskey's condition and took reasonable measures to deal with it. Brown's course of treatment was to engage Plaintiff in one-on-one counseling to discuss his suicide attempts and threats alongside his substance abuse problems. On November 30 and December 6, 2006, these efforts were rebuffed. (UMF ¶¶ 54, 86). Rather than engaging in the counseling process with Brown, Comiskey was verbally abusive and aggressive toward her and made repeated suicidal threats. (UMF ¶¶ 53, 55, 87, 91). In light of Comiskey's two suicide attempts, his continued suicidal threats, and his refusal to accept help and counseling from Brown, Brown was concerned for Comiskey's safety and decided, along with Jail Command, to protect Comiskey from himself by continuing to keep him on suicide watch. (UMF ¶¶ 57, 88, 90). While Comiskey may have preferred a different counseling approach, the very fact that Brown devised a course of treatment and attempted to engage Comiskey in counseling shows that she did not disregard his needs.

After returning from her vacation on December 18, 2006, Brown persisted in her attempts

to engage Comiskey in one-on-one counseling. (UMF ¶ 92). Her efforts were again met with hostility and a general refusal to take counseling seriously, and likewise take seriously his recent suicide attempts and troubles with substance abuse. (UMF ¶¶ 95 - 99). Rather, Comiskey simply expressed a desire to be moved to the general population and to eat standard issue food - not finger food. (UMF ¶¶ 93, 97). Despite Comiskey's refusal to engage in treatment, the next day, on December 19, 2006, Brown met with Lt. Jones to discuss Comiskey's desires. (UMF ¶ 101). At that time, based on Comiskey's recent suicide attempts and counseling sessions with Brown, it was Brown's professional opinion that Comiskey could not be trusted to not harm himself were he returned to the general population. (UMF ¶¶ 102 - 103). Instead, Brown suggested a rewards system whereby Comiskey would be allowed certain privileges not routinely associated with a suicide watch, such as hot food with utensils. (UMF ¶ 104). The purpose of the system was to assess how Comiskey would respond. By responding well, i.e., returning all eating utensils and otherwise abiding by jail rules, Comiskey could build trust and show Brown and jail staff that he could be trusted to not commit suicide and was otherwise ready to safely return to general population. (UMF ¶ 105). This plan was conveyed to Comiskey on December 20, 2006. (UMF ¶106 - 107). For the first time since entering suicide watch, Comiskey was responsive to Brown's counseling. (UMF ¶¶ 115 - 117). Ultimately, Comiskey gained trust through the rewards system, showed an ability to comply with jail rules, did not degrade Brown or other jail staff, nor threaten to take any actions in furtherance of suicidal threats. (UMF ¶¶ 119, 122, 125 - 129). As a result, on December 27, 2006, Comiskey was moved back to the general population of the Macon County Jail. (UMF ¶¶ 129 - 130).

While Comiskey may have preferred a different type of counseling than that provided by Brown, there is no question that Brown did in fact have a plan and implemented that plan. Brown continually met with Comiskey until he was ready and able to engage in the process. At that point, Brown devised a system whereby Comiskey could incrementally show that he had self control and was no longer suicidal. At that point, and only at that point, he was moved back to general population. Deliberate indifference is to know of a serious need and to consciously disregard it. Here, Brown saw a need and responded to it. To the extent that Comiskey feels her counseling was misguided, that is not actionable under Section 1983. The type of counseling to provide, the frequency for which it should be provided, and the substance and the content of the counseling sessions are clearly a matter for the counselor's judgment, and not a matter of constitutional law.

Finally, Comiskey alleges "maybe if I got treatment I would not have attempted suicide twice in prison." (Compl.) Comiskey's two suicide attempts both occurred on November 30, 2006, the day after he was placed on suicide watch. (UMF ¶¶ 48, 73 - 75). In fact, the first of these attempts, when Comiskey attempted to cut his wrist with a sharpened plastic spoon, occurred before Brown met with Comiskey. (UMF ¶ 48). At that counseling session, Brown was met with hostility and Comiskey's refusal to engage in discussion or otherwise receive mental health treatment. (UMF ¶¶ 51, 54 - 55). Comiskey's second suicide attempt happened later that same day where he was found trying to take a shoestring from an inmate's shoe in order to hang himself. (UMF ¶¶ 72 - 77). Brown can only be held liable for that which she was deliberately indifferent. Here, the first suicide attempt was before Brown even had a chance to

attempt counseling with Comiskey. The second was after Brown's efforts were rebuffed. For these reasons, Sharon Brown is entitled to summary judgment.

Defendant Sharon Brown is entitled to summary judgment on the issue of punishment as Plaintiff was not punished, but rather restrictions were placed upon him in order to prevent him from committing suicide or otherwise harming himself. "When a state actor such as the county deprives a person his ability to care for himself by incarcerating or detaining him, it assumes an obligation to provide some minimal level of well-being and safety." *Rapier*, 203 F.Supp.2d at 984 (*citing Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1999)); *see also Estate of Novack*, 226 F.3d at 529. "Therefore, case law has held that jailers must make efforts to prevent obviously suicidal detainees from committing suicide." *Rapier*, 203 F.Supp.2d at 984 (citations omitted); *see also Estate of Novack*, 226 F.3d at 529 ("Suicide is a 'serious harm' and prison officials must take reasonable preventive steps when they are aware that there is a substantial risk that an inmate may attempt to take his own life."); *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992). These efforts and steps required are principally to maintain and preserve life, not to cure mental illness. *See Collignon*, 163 F.3d at 991. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate government objective, it does not, without more, amount to 'punishment.'" *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). "A court must decide whether the disability [i.e., a particular restriction or condition] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538. Taking reasonable steps to prevent suicidal detainees from committing suicide is a legitimate governmental purpose. *See Rapier*, 203 F.Supp.2d at 984; *Estate of Novack,* 226 F.3d at 529. To prevent suicide, "inmates may be deprived not only of belts and ties but also of pens, sheets, blankets, even clothing, for almost any object may be used to harm oneself . . . ." *Myers v. County of Lake, Indiana*, 30 F.3d 847, 850 (7th Cir. 1994) (discussing Indiana law which requires institutions to use reasonable care to prevent their wards from committing suicide). Also, suicide watch policies whereby suicidal detainees are housed in special needs cells and placed on 15 minute visual checks have been met with approval by this District. *See Rapier*, 203 F.Supp.2d at 984. In this case, Comiskey alleges that he was punished for expressing his suicidal tendencies by being placed in a cell without clothes, heat or bedding and half rations for thirty days. (Compl.); Comiskey attempted to commit suicide on two separate occasions while in the Macon County Jail. (UMF ¶¶ 48, 73 - 75). In addition to these two suicide attempts, he made repeated statements that he would not leave the jail alive. (UMF ¶¶ 16, 41, 44, 53, 63, 87, 91). The reasonable restrictions placed upon Comiskey were not punishment; rather, they were prevention. After telling Correctional Officer Smith that he was suicidal, pursuant to Macon County Jail policies and procedures, Comiskey was placed in an intake cell where he could be more easily monitored on a 15-minute basis. (UMF ¶¶ 16 - 17, 28 - 29). Additionally, he was not permitted to wear typical jailhouse clothing, which can be torn and used to hang oneself. (UMF ¶¶ 23 - 25). Instead, Plaintiff was provided a suicide smock which cannot be torn and therefore cannot be used as a tool of suicide. (UMF ¶¶ 23 - 25).

Additionally, Comiskey was not given a mattress. (UMF ¶ 27). This was not in any way to punish Comiskey for having suicidal thoughts, but rather was to prevent him from carrying

out those thoughts.  Mattresses, like clothing, can be torn and used to create a noose.  (UMF ¶ 26).
Brown and the Macon County Jail have an interest, and in fact a duty, to protect and make reasonable efforts to prevent inmates such as the Plaintiff from committing suicide.  Suicide cannot always be prevented.  Moreover, it is impossible to predict with any degree of certainty when a person will attempt suicide.  That being said, here is an exemplary case of when signs of suicide presented, appropriate actions were taken and suicide was prevented.  Plaintiff further complains that he was provided one-half rations.  These "one-half rations" are in fact nothing more than a finger food diet.  The finger food diet at the Macon County Jail regularly consists of a sandwich, chips, drink, or similar items that do not require an eating utensil.  (UMF ¶ 69).  An inmate who receives a finger food diet is not on a one-half ration diet.  (UMF ¶ 70).  The only reason that Comiskey was placed on this finger food diet was that he attempted suicide with a spoon that was provided to him on a food tray containing hot food. (UMF ¶¶ 67 - 68, 71).  Thus, as a necessary preventative measure and pursuant to Macon County Jail policies and procedures, Comiskey was prohibited from having any utensils in order to prevent him from further harming himself.  (UMF ¶ 71).

Last, Plaintiff complains that he was placed in a cell without heat. (Compl). Macon County Jail leases the property from the Decatur Public Building Commission. (UMF ¶ 30).  The Building Commission is responsible for controlling the temperature in the Macon County Jail. (UMF ¶ 30).  There is no individual thermostat or temperature control for the individual cells. (UMF ¶ 32).   Rather, the same heat that flows through the cells in the booking area and the intake cells flows through all the cells in the entire jail.  (UMF ¶¶ 31, 33).  Mr. Comiskey's cell was not singled out and made to be cold or otherwise uncomfortable.  (UMF ¶¶ 30 - 34).  Rather, the same conditions were throughout the jail, including the administrative areas where jail employees work on a daily basis.  (UMF ¶¶ 31, 33).  Comiskey was not punished for expressing suicidal thoughts.  The restrictions placed upon Comiskey were to protect his safety and preserve his life.  Brown did not place Comiskey on suicide watch, did not put him in a suicide smock, did not put him on a finger food diet, and did not control the temperature in his cell.  (UMF ¶¶ 18, 25, 34, 71, 137).  Comiskey was placed on suicide watch pursuant to Macon County Jail policies and procedures after expressing suicidal thoughts.  (UMF ¶¶ 18, 134 - 135, 137).  For these reasons, Sharon Brown is entitled to summary judgment on Plaintiff's claim that she punished Comiskey for expressing suicidal thoughts.

This is definitely not a case of deliberate indifference to serious medical needs or punishment for seeking treatment.  Rather, this is a success story. Comiskey entered the Macon County Jail on October 31, 2006.  Approximately a month after he arrived there, he began to experience anxiety and depression with suicidal tendencies.  After he expressed his suicidal ideation, he was promptly placed on suicide watch and then offered counseling services on a routine basis by Brown.  In order to protect Comiskey from himself, his clothes were removed and replaced with a suicide smock, he was placed in an intake cell where he could be placed on 15-minute visual inspections, and because he attempted suicide with an eating utensil, he was placed on a finger food diet.  Sharon Brown was responsive to Plaintiff's needs, and in fact Plaintiff was restored to the general population as he had overcome, with the help of Sharon

Brown, his suicidal thoughts.  Ultimately, Comiskey was transported from the Macon County Jail to the custody of the Illinois Department of Corrections where he remains today.

Is therefore ordered:

1. Pursuant to Fed. R. Civ. Pro. Rule 56(c), the defendants' unopposed summary judgment motion [36] is granted.  The clerk of the court is directed to enter a judgment in favor of the defendant and against the plaintiff.  Any remaining matters are rendered moot, and this case is terminated, with the parties to bear their own costs.
2. If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Enter this <u>14th</u>   day of July 2009.

<u>**s\Harold A. Baker**</u>

_____
Harold A. Baker
United States District Judge